AO 106 (Rev. 06/09)   Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Eastern District of Missouri

| | |
|---|---|
| In the Matter of the Search of )<br>)<br>THE PREMISES LOCATED AT: **911 Locust** )<br>**Street, Apt. #204, St. Louis, Missouri 63101,** )<br>further described in Attachment A. )<br>) | Case No. 4:21 MJ 3063 NCC<br><br>SIGNED AND SUBMITTED TO THE COURT<br>FOR FILING BY RELIABLE ELECTRONIC MEANS |

### APPLICATION FOR A SEARCH WARRANT

I, __Christopher Eaves__, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

THE PREMISES LOCATED AT: **911 Locust Street, Apt. #204, St. Louis, Missouri 63101,** further described in Attachment A.

located in the _____EASTERN_____ District of _____MISSOURI_____, there is now concealed

see ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):
- ✓ evidence of a crime;
- ✓ contraband, fruits of crime, or other items illegally possessed;
- ✓ property designed for use, intended for use, or used in committing a crime;
- ❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 841(a)(1), 846 | Conspiracy to possess with intent to distribute controlled substance(s) |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE.

- ✓ Continued on the attached sheet.
- ❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the foregoing is true and correct.

_____
*Applicant's signature*

CHRISTOPHER EAVES, Special Agent
DEA
_____
*Printed name and title*

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: _____April 7, 2021_____

_____
*Judge's signature*

City and State: ____St. Louis, MO____

Hon. Noelle C. Collins, U.S. Magistrate Judge
*Printed name and title*
AUSA: John R. Mantovani

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | ) | |
| TARGET RESIDENCE LOCATED AT: **911** | ) | No. 4:21 MJ 3063 NCC |
| **Locust Street, Apt. #204, St. Louis,** | ) | |
| **Missouri 63101.** | ) | |
| | ) | FILED UNDER SEAL |
| | ) | |
| | ) | SIGNED AND SUBMITTED TO THE COURT FOR FILING |
| | ) | BY RELIABLE ELECTRONIC MEANS |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Christopher Eaves, being first duly sworn by reliable electronic means, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **911 Locust Street, Apt. 204, St. Louis, Missouri 63101** (hereinafter the "**Target Residence**") further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice (DOJ).  As such, I am an investigative and law enforcement officer of the United States (U.S.) within the meaning of Title 18, U.S. Code, Section 2510 (7), who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, U.S. Code, Section 2516 and offenses enumerated in Title 21 U.S. Code.

3.      I am currently assigned to Task Force Group 38 at the DEA St. Louis Division Office, St. Louis, Missouri (SLDO) and have worked for the DEA since August, 2010. Prior to my

employment with the DEA, I served as a Deputy Sheriff for the Jefferson County Sheriff's Office in Jefferson County, Missouri for approximately nine (9) years. For three and a half years I was assigned as a Task Force Officer to the DEA St. Louis Division Office Group 37 Long Term Investigation and Conspiracy Group. Prior to working with the DEA, I was a detective assigned to the Jefferson County Drug Task Force for approximately one and a half years. I attended the Drug Enforcement Administration Special Agent Training Academy, in Quantico, Virginia, and received training and instruction regarding the practices, methods, tools, devices, customs, and routines commonly used by persons engaged in drug trafficking. I also received training and education from the United States Attorney's Office in different jurisdictions, as well as numerous local law enforcement agencies and various organizations dedicated to the continuing education and training of law enforcement personnel. In connection with my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, and 848; money laundering laws, including Title 18, United States Code, Sections 1956 and 1957; and firearms laws, including Title 18, United States Code, Section 922. I have also been involved in various types of electronic surveillance and in the debriefing of witnesses, informants, and others who have knowledge of drug trafficking and laundering of drug proceeds. I have conducted investigations relating to the importation, distribution, manufacturing and possession of narcotics and other contraband. Using various investigative techniques relating to identifying criminal violations, I have conducted investigations which have resulted in criminal convictions of numerous defendants as well as the seizure and forfeiture of assets used or intended to be used to facilitate drug trafficking. Since my employment with DEA as a Special Agent and Task Force Officer, I have conducted and/or participated in

2

numerous investigations involving illegal drugs and money laundering. During these investigations, I have been involved in seizures of marijuana, heroin, fentanyl, methamphetamine, cocaine, MDMA, LSD, and bulk United States currency. I have interrogated numerous subjects/defendants involved in and/or arrested for drug and narcotics violations and money laundering. I also have participated in numerous joint interagency federal and state investigations. Additionally, I have established and supervised confidential sources; prepared and executed search warrants and arrest warrants; conducted physical surveillance; and monitored and reviewed court-ordered and consensually recorded conversations of drug traffickers. I have also successfully coordinated the controlled deliveries of narcotics, in which involved the transportation of kilogram quantities of heroin, marijuana, cocaine, and methamphetamine. As a DEA Special Agent, I was the affiant or case agent on cases involving several Title III wire intercepts. My investigations have resulted in criminal convictions of numerous defendants as well as the seizure and forfeiture of assets used or intended to be used to facilitate drug trafficking.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe the violations of Title 21, United States Code, sections 841(a)(1) and 846 (conspiracy to distribute methamphetamine) have been committed by **Jerron BENSON**, Charee OLIVER, Arion ROME, Alonzo WALDON and other co-conspirators known and unknown. There is probable cause to search the location(s) described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION(S) TO BE SEARCHED

5.      The **Target Residence** is an apartment, or an individual dwelling unit, in as a seven-story multiple-dwelling apartment complex located in the City of St. Louis, State of Missouri with an address of **911 Locust Street, Apartment #204, St. Louis, MO 63101**. The building exterior is brownish red brick with commercial space located on the first floor. "Board of Education" is etched into the brick above the exterior entrance. The primary exterior entrance to enter the building is a double glass door secured entrance covered by a black awning that is identified as "The Lofts." The numerals '911' are listed on a glass pane above the double doors. **Target Residence** is an apartment located on the second floor of the building and numbered 204. The **Target Residence** is labeled with the numbers "204" affixed on or near the door to the apartment.

## RELIABILITY OF INFORMATION

6.      The information in the Affidavit is based on my personal involvement in the investigation of this case, law enforcement reports, records, surveillance, information received from other law enforcement agents, my experience and training, and the experience of other agents. Because of this Affidavit's limited purpose, it does not contain all of the facts known to me or other law enforcement officers about the investigation. I have set forth only the facts I believe are necessary to establish the necessary foundation for securing authorization for establishing probable cause for a search warrant for the **Target Residence**.

## INVESTIGATION AND PROBABLE CAUSE

**A.      Identification of BENSON and Target Residence.**

7.      In the spring of 2020, DEA Group 38 began an investigation into the drug trafficking activities of **Jerron BENSON**. During May of 2020, investigators were able to identify **BENSON**'s residence at **911 Locust, #204, St. Louis, Missouri (Target Residence)**. Investigators conducted a utilities check of **BENSON**, which indicated **BENSON** had active utilities at that location.  As of April 2021, investigators again conducted another utilities check that revealed that **BENSON** continues to have active services at **Target Residence**. Investigators further identified this as **BENSON**'s address during numerous surveillances of **BENSON** coming and going from the address. On June 8, 2020, investigators gained authorization through the Eastern District of Missouri to initiate a Title III wire intercept on **BENSON**'s cellular telephone utilizing number (314) 478-4546.  During the 30 days that **BENSON**'s cellular telephone was intercepted, investigators intercepted many drug related communications. It was evident during the interception period that **BENSON** historically had been an active drug distributor in the St. Louis area but was having issues getting methamphetamine. It appears that during the interception period that **BENSON** was selling marijuana to make money.  In June 2020, the COVID-19 pandemic and governmental restrictions had severely curtailed cross-border traffic between the United States and Mexico, the likely source of **BENSON**'s methamphetamine. DEA was receiving intelligence both locally and nationally about a major drug shortage. It was evident that the pandemic-caused shortage was affecting **BENSON**'s ability to traffic methamphetamine. In spite of the supply chain issues related to methamphetamine, numerous calls were intercepted over **BENSON**'s cellular telephone related to drug trafficking. Ultimately, after 30 days, interception

5

of **BENSON**'s cellular telephone was ceased, and he was not charged with a drug trafficking crime at that time.

**B.     Controlled Purchases from WALDON and ROME.**

8.      In October of 2020, the St. Charles County Regional Drug Task Force (SCCRDT) initiated an investigation into a subject identified as Alonzo WALDON. During the investigation an undercover detective (UC) was able to be introduced to and begin buying methamphetamine from WALDON. The UC engaged in numerous controlled drug transactions with WALDON for various quantities of methamphetamine. DEA group 38 began working with the SCCRDTF on the WALDON investigation. On December 28, 2020, the UC conducted a controlled transaction of one ounce of methamphetamine from WALDON for $570.  During the buy operation, the UC picked WALDON up from a hotel in the St. Louis area and drove WALDON to a Burger King parking lot on West Florissant Road in St. Louis County at WALDON's direction. While in route to the location, WALDON placed a phone call to what was later determined to be phone number (314) 477-1819, which was subscribed to Arion ROME. The UC arrived at the Burger King parking lot and WALDON entered a silver Pontiac Grand Prix with the pre-recorded buy money. ROME exited the car and entered the UC vehicle and provided the methamphetamine to the UC. After the transaction, surveillance was maintained on the Pontiac. It was followed back to an address in Spanish Lake, Missouri. Later in the evening the Pontiac was followed to an apartment building at 911 Locust in St. Louis  City, the location of **Target Residence**. ROME was observed exiting the apartment building.  An analysis of ROME's cellular telephone number, (314) 477-1819, for phone activity during the time he was at the **Target Residence**'s building revealed that

he exchanged phone calls with **BENSON**'s cellular telephone, (314) 478-4546.[1]  After ROME

drove away from the area of **Target Residence**'s building, a traffic stop was attempted on the him

by a marked patrol car.  ROME fled the traffic stop, and officers were unable to locate him.

Subsequent controlled buys by the UC from WALDON over the next month confirmed that that

ROME was WALDON's source of supply for methamphetamine at that time.

      **C.**     **Interception of ROME's Cellular Telephone.**

      9.     Based on the above UC controlled drug purchases from ROME, surveillance, the

previous investigation of BENSON, and other evidence, on February 12, 2021, a Title III wire

intercept was signed by the Honorable Judge Ronnie L. White for ROME's cellular device. The

intercept of ROME's phone was initiated on February 12, 2021. As investigators began monitoring

ROME's cellular telephone activity and conducting surveillance on ROME, it was clear that

**BENSON** was ROME's source of supply for methamphetamine. On a frequent basis WALDON

would contact ROME to purchase methamphetamine. ROME then contacted **BENSON** around

the same time as those communications.  WALDON also made it clear to the UC that WALDON's

source (ROME) would have to travel to his (ROME's) source (**BENSON**) to buy

methamphetamine that ROME would sell to WALDON who would then sell it to the UC. An

example of this is as follows:

---

[1]     After observing ROME arrive at the Target Residence's building and toll analysis revealed that ROME was contacting **BENSON**'s cellular telephone, investigators did further research. It was found that ROME had contacted **BENSON** during the Title III intercept of **BENSON**'s cellular telephone in June of 2020. At the time, investigators knew that **BENSON** was talking to one of his customers, but **ROME** had been unidentified at that time.  However, after identifying ROME and his cellular number, investigators reviewed those calls and were able to identify ROME as one of **BENSON**'s customers on the June 2020 interceptions.

10.     On February 18, 2021, the SCCRDT UC arranged to meet with WALDON to purchase three ounces of methamphetamine from him. At approximately 1:18 PM, a call was intercepted on ROME's cellular telephone from WALDON's cellular telephone. During the call, WALDON explained to ROME that he was going to be bringing a methamphetamine customer with him to meet ROME to purchase a "cutie." I know from training and experience a "cutie" is slang terminology for a quarter pound of an illegal narcotic, which in this case was methamphetamine. The UC picked up WALDON from a hotel and drove with WALDON to Larimore Liquor on Larimore Road. While WALDON and the UC were in route to this location, WALDON called ROME and the call was captured on the interception of ROME's cellular telephone. WALDON told ROME he was getting off the highway. This was happening as the UC was getting close to 270 at Bellefontaine Road. WALDON also advised that he had "two rackolas...two racks." From training and experience, I know this is terminology for two thousand dollars. ROME then said he could get him "five." Investigators understand "five" to mean five ounces of methamphetamine for an understood price of $400 per ounce. The UC parked his vehicle in the liquor store parking lot. A short while later ROME arrived and parked his vehicle on the parking lot. WALDON entered ROME's vehicle and then quickly exited. WALDON then reentered the UC vehicle. The UC drove WALDON back to his hotel and after arriving at the hotel parking lot, WALDON gave the UC 99 grams of methamphetamine.

11.     At approximately 2:52 PM on the same day and a short time after completing the transaction with WALDON and the UC, ROME, placed a call to **BENSON**, which was intercepted on ROME's cellular telephone. **BENSON** and ROME had some initial conversation about what

8

they      were      doing      and      then      had      the      following      conversation:

**BENSON**:     I can borrow my baby mama in my car if I need to. Do I need to?

ROME:     I mean, yeah. You'll probably want to. But shit. We still ain't went over the numbers too much.

**BENSON**:     Yeah, we'll figure it out when get... When uh, I, I, [U/I]. Then we gonna have to figure...we gonna sit down.

ROME:     I know we was at...

**BENSON**:     I don't wanna, I don't wanna rap right now. I'll rap when I see you. You ain't got no way huh?

ROME:     No.

**BENSON**:     Alright. I'll get out there to you.

ROME:     Alright.

During the above call, ROME called **BENSON** and inquired about meeting up. ROME stated, "…You'll probably want to. But shit. We still ain't went over the numbers too much." **BENSON** stated that they needed to talk about the numbers and ROME started to say something else. **BENSON** interrupted ROME and stated, "I don't wanna, I don't wanna rap right now. I'll rap when I see you." **BENSON** ended the call by stating that he was going to come and visit ROME. This call from ROME to **BENSON** occurred approximately 30 minutes after ROME completed the transaction with WALDON.  From my training and experience with these types of investigations, I believe that ROME was contacting **BENSON** because ROME had just acquired money from WALDON and ROME was paying **BENSON** the drug proceeds from that sale and/or pre-paying for another amount of methamphetamine. Further, this call illustrates **BENSON**'s savviness when he refuses to discuss specifics over the phone due to the possibility of law enforcement monitoring

9

the phone conversation. At approximately 4:21 PM, investigators conducting surveillance of ROME's residence observed **BENSON** arrive at ROME's residence. A captured call between ROME and **BENSON** over the Title III also verified that **BENSON** was at ROME's residence. From my training and experience and the above intercepted call, I believe this was the meeting discussed above where ROME was paying **BENSON** for the methamphetamine that ROME had just sold to WALDON to sell the UC.

13.     On February 24, 2021, surveillance was conducted on ROME. At approximately 10:39 AM, ROME received a call from WALDON on WALDON's cellular telephone. In the call, WALDON stated, "Shit, tryna see if you heard anything?" ROME replied, "Shit, I'm just now getting up but I'm finna put it together now." In this call from my training and experience I believe that WALDON was initiating a future drug transaction with ROME. WALDON asked if "you heard anything" is likely a reference to see if ROME has checked with his (ROME's) source (**BENSON**) concerning the availability of methamphetamine.

14.     At approximately 10:47 AM, ROME received a phone from **BENSON**. ROME and **BENSON** had the following conversation:

| | |
|---|---|
| ROME: | Hello. |
| **BENSON**: | What up? |
| ROME: | What's the word? |
| **BENSON**: | Ain't shit. You up? |
| ROME: | Yeah, just got up. |
| **BENSON**: | You talk to your man? |
| ROME: | Yeah. |

10

**BENSON**:     Alright.

ROME:     Shit, you mobile?

**BENSON**:     Yeah, I guess so. I don't wanna be, but I guess uh, yeah I guess I can come out that way.

ROME:     It would make it a whole lot easier.

**BENSON**:     You need to get in contact with him first or what?

ROME:     Naw, I already talked to him. Waiting on me to give him the go. He's been ready since last night.

**BENSON**:     I know I know. That was my fault. I couldn't (U/I) it in. Alright, well call me when he, let me know when he on the way or whatever. I'll come out.

From my training, experience, and the monitoring of these calls during this time-frame, I believe that **BENSON** asked ROME if he talked to WALDON when he asked, "You talk to your man?" ROME said he had. ROME advised that WALDON has "been ready since last night." **BENSON** told ROME to let him know when WALDON is on his way and he would "come out."  I also believe that **BENSON** was inquiring if ROME had talked to WALDON about the transaction, and that when WALDON and ROME plan to meet ROME should call **BENSON**. I further believe due to the conversation in this call that ROME needed to meet with **BENSON** before meeting with WALDON to resupply methamphetamine.  Based on the above call, it appears that ROME only keeps a relatively small amount of methamphetamine available at his residence and regularly needs to resupply with **BENSON** when ROME's supply runs low.

15.     At approximately 12:57 PM on the same day, ROME placed an outgoing phone call to WALDON on WALDON's cellular telephone. In the call, ROME stated, "Yeah, my fault bro, I'm trying to get it all set up now. Basically just on my peoples and shit." With that statement,

11

I believe that ROME is still trying to get a quantity of methamphetamine from his source (**BENSON**) and ROME is waiting on **BENSON**. ROME asked WALDON if it was the "same thing." WALDON responded by saying, "Yeah I mean Imma have to start mining the paper back up it's still the same if not more." WALDON was advising that he will be getting the same quantity of methamphetamine that he discussed previously. WALDON also advised that he need to "start mining the paper back up." I know from training and experience that "paper" is a slang terminology used by drug traffickers to reference money and that "mining the paper back up" means to collect drug proceeds and/or payments to pay his source of supply (**BENSON**) to pay for or make a payment towards the methamphetamine.

16.     At approximately 1:11 PM, ROME placed a phone call to **BENSON**. Both parties agreed to meet. At approximately 2:29 PM, ROME received a phone from **BENSON**. ROME and **BENSON** had the following conversation:

| | |
|---|---|
| ROME: | Hello, Hello. |
| **BENSON**: | You inside the (U/I) garage? |
| ROME: | Uh-uh. Shit I can be though. |
| **BENSON**: | Yeah, I'm inside the garage. |
| ROME: | Alright three minutes. |
| **BENSON:** | Huh? |
| ROME: | I said alright three minutes. |

In the above call and from training, experience, and the instant investigation, I believe **BENSON** was directing ROME into **BENSON**'s parking garage of **Target Residence**. TFO Josiah Merritt

was close to that location and responded to **Target Residence**'s building to attempt to observe ROME's arrival. At that same time, I was reviewing pole camera footage from the camera located at ROME's residence at 11300 Larimore. At approximately 1:15 PM, I observed ROME exit his residence and enter a maroon Chrysler Voyager van. I am familiar with the Chrysler because it has often been parked at ROME's residence, and we were previously able to identify it based on its Missouri License Plate VF6 T6G.[2]   ROME pulled out of the driveway and left his residence.

17.    Shortly after driving away from his residence, ROME placed another call to WALDON on WALDON's cellular telephone and advised that he (ROME) was with "his people now." WALDON said he was "at the spot," and ROME said he would be heading that way soon. At approximately 2:59 PM, ROME placed an outgoing call to **BENSON**. They had the following conversation in relevant part:

ROME:       Yeah I gotta go. I got somebody waiting on me.

**BENSON**:   Alright. Here…I'm walking down now and…

ROME:       Alright

**BENSON**:   Matter of fact, you can walk straight out and (U/I) here I come. Here I come.

ROME:       Alright.

At approximately 3:05 PM, TFO Merritt was parked near the entrance/exit to the parking garage associated with **Target Residence**'s building. A court authorized cellular telephone precision location warrant (PLW) on ROME's cellular telephone showed that ROME was in the downtown

---

[2]    The maroon Chrysler Voyager van displaying Missouri License Plate VF6 T6G was observed by surveillance units parked on a regular basis parked in front of ROME's home residence of 11300 Larimore Drive.

area within the geographical radius of **Target Residence**. TFO Merritt then observed ROME's maroon Chrysler Voyager at the ticket booth at the exit of the **Target Residence**'s building's parking garage. TFO Merritt observed the vehicle back up from the booth and go back into the garage. TFO Merritt covertly entered the garage and confirmed that the license plate on the van as VF6 T6G. TFO Merritt also observed that a subject that appeared to be a female was driving the van and a male was in the passenger seat. TFO Merritt could not positively verify the identity of the passenger due to his view inside that portion of the vehicle being obscured. However, from the calls and surveillance agents observing ROME enter the van before departing his residence, it is believed that the passenger was ROME.

18.    At the same time TFO Merritt was observing the Chrysler in the parking garage of **Target Residence**'s building, ROME placed an outgoing call to **BENSON**. They had the following conversation:

| | |
|---|---|
| **BENSON**: | Yo. |
| ROME: | I lost my uh, parking ticket. Oh my God. Really cuz? |
| **BENSON**: | What? |
| ROME: | You got the bag open and shit. This shit just bust everywhere. |
| **BENSON**: | Aww. |
| ROME: | And…and I lost my fuckin…talking about, its forty-eight dollars if you lose it? |
| **BENSON**: | How you lose it man? |
| ROME: | Fuck. I'm coming back up bro, this is some straight bullshit. You ain't even have the bag tied up. This motherfucker (U/I). |
| **BENSON:** | I did. It's in … it's doubled up. I mean hand with care. I mean (U/I). |

In the above call and from training, experience, TFO Merritt's observations and the above call, I believe, ROME was complaining to **BENSON** that he lost his parking ticket and that losing it could cost him $48. TFO Merritt observed ROME and his driver backing up from the ticket booth because ROME could not locate the parking ticket.  As that was occurring and ROME was searching for his parking ticket, ROME spilled methamphetamine from the quantity **BENSON** had given him stating "Oh my god, Really cuz? You got the bag open and shit.  This shit just bust everywhere" Later he stated, "…You ain't even have the bag tied up. This motherfucker (U/I)." **BENSON** responded by saying, "I did. It's in … it's doubled up. I mean hand with care. I mean (U/I)." I know from the totality of the calls intercepted that ROME was in the process of acquiring methamphetamine from his source to sell to WALDON. ROME advised that he had to meet his source (**BENSON**) to get the methamphetamine. With the above call, ROME clearly indicated that he had one or more of the bags of methamphetamine broke open in the van while at the **Target Residence**'s building's parking garage.  **BENSON** confirmed that the bag came from him (**BENSON**) by referencing how **BENSON** packaged that bag when **BENSON** gave it to ROME by "it's doubled up. I mean hand with care." It is clear from this call that ROME has just acquired methamphetamine from **BENSON** and was now in the parking garage of **Target Residence**. **BENSON** placed an outgoing phone call to ROME just prior to the above call.  In that call ROME stated, "I gotta go. I got somebody waiting on me." **BENSON** responded by stating, "Alright. Here, I'm…I'm walking down now…" **BENSON** said "walking down."  Based on the layout of the **Target Residence**'s building and the location of **Target Residence** on the second floor, I believe that **BENSON** was telling ROME that he is coming down from **Target Residence** to meet

15

with ROME and provide him with the methamphetamine because ROME was in a hurry to meet with someone else (WALDON) that was "waiting on [him]."

19.      About 15 minutes later, at approximately 3:23 PM, TFO Merritt observed the maroon Voyager exit the **Target Residence's** apartment complex garage. TFO Merritt followed the Voyager as it traveled north on North Broadway. TFO Merritt ultimately lost sight of the van and was not able to continue following it. Later in the evening on February 24, 2021, several calls were intercepted ROME and WALDON and it was clear from the calls that ROME sold WALDON methamphetamine.

**D.      Interception of BENSON's Cellular Telephone.**

20.      On March 16, 2021, the Honorable Judge Stephen R. Clark authorized a 30-day interception of **BENSON**'s cellular telephone. Agents transitioned to monitoring **BENSON**'s cellular telephone through evidence acquired while monitoring ROME's cellular telephone. It was clear while monitoring **BENSON**'s cellular telephone that methamphetamine was being stored in **Target Residence** and possibly other places within the **Target Residence** building, as described below. Further, investigators observed not long after intercepting **BENSON**'s telephone that WALDON was directly communicating with **BENSON** frequently and appeared to be replacing ROME as one of **BENSON**'s direct distributors.[3]   ROME and **BENSON**'s communication dropped to a very low number of calls.

---

[3]      **BENSON** and WALDON have been communicating on a frequent basis during the intercept of **BENSON**'s phone. We have attempted to conduct surveillance of those meetings and conduct traffic stops of individuals after the meetings to intercept the drugs being sold. Many times due to lack of notice concerning the meetings or the inability to get marked patrol cars in position, those traffic stops have not been able to occur. Listed in this affidavit are some examples of **BENSON** and WALDON meeting and the surveillance observations of those meets. Due to space limitations, this affidavit only contains some of those meetings, but not every meeting or communication between **BENSON** and WALDON are listed in this affidavit.

21.     On March 17, 2021, surveillance was being conducted on **BENSON** and **Target Residence**'s building. At approximately 1:23 PM, **BENSON**'s cellular telephone was intercepted receiving an incoming phone call from WALDON. After conversation about vehicles, the discussion became pertinent in nature.

| | |
|---|---|
| WALDON: | When I call you back, I'll just call you back with a time that you can see the Journey and by that time I will have put together the remainder of the bread for the Benzo. |
| **BENSON**: | You said what? |
| WALDON: | I said, when I call you back I'll let you call me back with like a schedule. I can pull up or… |
| **BENSON**: | Alright you ain't got…did you get the (U/I) text?[4] |
| WALDON: | Mmm, I'm just waking up. I ain't got shit. |
| **BENSON**: | Alright. A green light. |
| WALDON: | Alright. |

In the above call, WALDON is explaining to **BENSON** that said he (WALDON) is putting the "bread" together. From training and experience, I know this is a commonly used term by drug traffickers for money. At the end of the call **BENSON** said "green light" with no reference to what that was referring to. From training, experience, and the instant investigation, I believe **BENSON** was referencing drug trafficking. It is common for drug traffickers to speak in very general non-

---

[4]     There have not been any text messages between **BENSON** and WALDON that have been intercepted on the Title III intercept.  Investigators do have authorization to capture text messages on **BENSON**'s phone, but there have been no text messages intercepted between BENSON and WALDON during this intercept. There have been references between **BENSON**, ROME, and WALDON about text messaging around drug related conversation. Investigators believe that the co-conspirators are utilizing an application-based text messaging platform such as Snapchat, WhatsApp, or some other platform.

specific terms while having telephone conversations. Further, "green light" was likely a reference about being able to proceed with a drug transaction. I know that the majority of the drug-related conversations between **BENSON** and WALDON occurs on some type of text message based application due to the continual reference of text messaging as referenced in this call above.

22.     At approximately 6:24 PM, an outgoing call was intercepted being placed by **BENSON** to WALDON. **BENSON** and WALDON had conversation and then at the end said the following:

WALDON:     Okay, if we make it 8:01ish you gonna be extremely happy to see me.

**BENSON**:     Alright I'll be at the crib smoking hooka.

After listening to the two above calls, investigators believed that **BENSON** and WALDON were going to meet to conduct a drug transaction at **Target Residence**. Investigators established surveillance at the **Target Residence**'s building. At approximately 8:20 PM, SA Rex Dixon observed a silver Kia Sorento with California license plate 8LCM970 arrive and park on Locust on the north side of the street near the entrance to **Target Residence**'s building. At approximately 8:22 PM, SA Dixon observed **BENSON** exit the front entrance to the **Target Residence**'s building and approach the front passenger door of the Kia.  SA Dixon observed **BENSON** lean into the front passenger door for a short period of time and then walk away with a white plastic bag and re-enter the front door to **Target Residence**'s building.  At approximately 8:54 PM, TFO Josiah Merritt observed a silver Hyundai Elantra with Missouri license plate, GE6 K2Y, arrive and park on 9th Street in the area of St. Charles, on the east side of the street directly in front of TFO Merritt's vehicle. TFO Merritt observed the vehicle was being driven by a white female and WALDON was

18

the front passenger. At approximately 9:12 PM, TFO Merritt observed WALDON exit the silver Hyundai and walk to and enter the front passenger door of a Chevrolet Impala. Surveillance was maintained on the Impala after it left its parking spot on Locust. After an approximate half an hour the Impala was observed parking in front of the **Target Residence**'s building and WALDON was still in the vehicle. I observed WALDON exit the Impala and walk to the north side of Locust and then east on Locust. St. Louis County Police Department Det. Derek Machens observed WALDON enter a black Dodge Journey parked on 9th Street near Locust. At approximately 9:43 PM, WALDON was observed by Det. Machens exiting the Dodge Journey and walking up to the entrance of the **Target Residence**'s building. Det. Machens observed WALDON entering the front door of the **Target Residence**'s building.  At approximately 10:40 PM, WALDON was observed exiting the alley on 9th Street and entering the Dodge Journey by Det. Machens. Surveillance was maintained on the Journey as it began driving north on 9th Street.

23.     The Journey was followed to the River City Casino and WALDON and a white male were observed entering the casino. Further investigation revealed that WALDON was staying in the hotel as a guest.[5]  The white male later left the casino and agents were attempting to follow the Journey to conduct a traffic stop on the Journey, but unfortunately lost sight of the vehicle in the casino parking lot and could not relocate the vehicle.

24.     Given the actions of WALDON in conjunction with the intercepted Title III phone calls, investigators believe WALDON met with **BENSON** at **Target Residence** and conducted a

---

[5]     The lengthy investigation into WALDON has revealed that he generally stays in hotels with no fixed permanent residence. WALDON also does not have a vehicle, but is driven around by others. Frequently these people are drug customers of WALDON's.

drug transaction. Specifically, the non-specific nature of the calls coupled with statements like "green light" and "you're gonna be extremely happy to see me" along with WALDON entering and exiting **Target Residence** in a short amount of time are characteristic of a drug transaction. Further, based on surveillance of WALDON and the UC buys, it is common when WALDON buys drugs to have the person he is buying drugs for drive him to acquire the drugs and wait in the vehicle while he meets with the person he is buying the drugs from. This is what the driver of the Dodge Journey did.

      **E.**      **Confirmation of BENSON's Use of Target Residence as his Residence.**

      25.      On March 24, 2021, **BENSON** received an incoming phone call from a debt collection agency. The call was initiated by the caller asking if the debt collector was speaking with "**Jerron BENSON**" and he said "yes." The debt collector then asked if he resided at "**911 Locust Street, Apt. 204, St. Louis, Missouri 63101**?" **BENSON** said "yes." The call was concerning an outstanding debt **BENSON** had with Charter Spectrum but confirms that **BENSON** lives in the **Target Residence**.

      **F.**      **Identification of OLIVER and BENSON's Continued Distribution.**

      26.      During the intercept of **BENSON**'s cellular telephone numerous calls have been captured that substantiate that **Target Residence** is still being used to store and distribute drugs. From intercepts on **BENSON**'s cellular telephone, it was clear **BENSON** was leaving on March 24, 2021, to take a trip to Dallas, Texas. From the content of the calls the trip appeared to be social in nature. However, while **BENSON** was gone, several pertinent calls were intercepted involving **Target Residence** and suspected drug trafficking with Charee OLIVER.

27.     On March 24, 2021, **BENSON** received an incoming call from Charee OLIVER.

A portion of the conversation was as follows:

**BENSON**:     Alright, call me when you uh…. I uh… left some wine in the wine cooler.

**OLIVER**:     What?

**BENSON**:     I left some wine I, in your wine cooler, 'cause your door was locked.

**OLIVER**:     My door was locked?

**BENSON**:     Hey, man just call me when you get home or something.

**OLIVER**:     I'm at home.

**BENSON**:     Oh, in your wine… in the cooler, shit.

**OLIVER**:     I see it… what about it?

**BENSON**:     What?!

**OLIVER**:     What about it?

**BENSON**:     I was saying you can take it out of your wine cooler and put in your room.

[Further conversation about **BENSON** being in Dallas, Texas and that a subject named "Boogie" has **BENSON**'s apartment keys".]

**BENSON**:     Alright, yeah get that wine out of there.

**OLIVER**:     Okay.

**BENSON**:     Alright.

**OLIVER**:     Alright.

From training, experience, and the instant investigation, during the above call, investigators and I believe **BENSON** and OLIVER were engaging in coded conversation that was referencing methamphetamine. **BENSON** informed OLIVER that he left "some wine in your wine cooler".

21

OLIVER seemed confused. **BENSON** clarified by saying, "…you can take it out of your wine cooler and put it in your room." At the end of the call **BENSON** again stated, "…yeah get that wine out of there." Investigators believe that the way **BENSON** was specifically instructing OLIVER, "can take it out of your wine cooler and put it in your room" was unusual for a bottle of wine. As described below, further intercepted calls between **BENSON** and OLIVER continue to use wine and "wine bottles" as code for methamphetamine and methamphetamine quantities. It also sounds from the content of this call that OLIVER was going to be placing "wine" (methamphetamine) in her apartment at 911 Locust Street, Apt. #306, St. Louis, MO 63101. OLIVER did not ask a lot of clarifying questions about doing this and it is believed from her responses that she likely has done this before for **BENSON**. A check was done on OLIVER. Utilities list OLIVER as having service at 911 Locust Street, Apt. 306, St. Louis, MO.[6]

28.     On March 25, 2021, **BENSON** and OLIVER had another coded conversation. The conversation was initially concerning OLIVER stating that an associate who appears to reside in the lofts at 911 Locust had custody of **BENSON**'s house keys and did not give OLIVER the keys. They then stated the following:

**BENSON**:     Alright. Uh… okay well I'mma have uh, dude come by to get that bottle of wine.

OLIVER:     The whole thing?

**BENSON**:     Uh-uh, just one bottle.

---

[6]     It was clear from investigators during the first intercept of **BENSON**'s phone and of from the current intercept of **BENSON**'s phone that OLIVER resided on the third floor of the same loft complex as **BENSON** and the **Target Residence**'s building. It is further clear from various calls intercepted on the wire between **BENSON** and OLIVER, I believe that **BENSON** and OLIVER have a daughter in common.

| | |
|---|---|
| OLIVER: | Okay. |
| **BENSON**: | Alright. |
| OLIVER: | The Moscato one? |
| **BENSON**: | Yeah. |

In the above call, **BENSON** advised that he was going to have "dude come back to get that bottle of wine." OLIVER responded by asking, "The whole thing" and **BENSON** stated, "just one bottle". OLIVER asked, "[t]he Moscato one?" and **BENSON** said, "yeah". From training, experience, and the instant investigation, believe that the way that **BENSON** and OLIVER were referring to wine in the above call was abnormal with statements such as "the whole thing", as wine bottle cannot be divided up. I further believe that the code word "Moscato," which is a type of wine that is usually white is a reference to methamphetamine, which is clear or white. **BENSON** is known to sell marijuana as was intercepted doing so on the wire of his cell phone in June of 2020. OLIVER was likely clarifying that "Moscato" was the methamphetamine as opposed to some other type of drug such as marijuana WALDON was supposed to pick up. Experience working these types of investigations and monitoring wire intercepts has taught me that drug traffickers will frequently use terms for legal items such as "tires" or "burritos" to refer to quantities of a particular controlled substance. Many times the use of those nouns is not consistent with how you would describe the items such as the "the whole one" when referring to a bottle of wine.

29.     Later, on March 25, 2021, **BENSON** received a call from WALDON. During the call WALDON asked, "Is that young lady around?" Investigators believe WALDON was referring to OLIVER.

30.    At 2:05 PM on the same day, OLIVER called **BENSON**. A portion of the conversation is as follows:

| | |
|---|---|
| **BENSON**: | How long before you leave? |
| OLIVER: | I'm leaving now. |
| **BENSON**: | aww… dude is gonna come grab a bottle of wine. I think he's close so I don't know if you'll be there. |
| OLIVER: | Ain't no more wine. |
| **BENSON**: | Huh? |
| OLIVER: | Ain't no more wine. |
| **BENSON**: | It ain't? |
| OLIVER: | Uh-uh. |
| **BENSON**: | Huh? |
| OLIVER: | No! |
| **BENSON**: | There was three (3), right? |
| OLIVER: | Yeah, he got three (3). |
| **BENSON**: | Oh. |
| OLIVER: | What you talkin' about? |
| **BENSON**: | Alright. Uhh... |
| OLIVER: | Huh? [PAUSE] What you say? |
| **BENSON**: | Is that right? |
| OLIVER: | Yeah, he came and got... you said give him three (3). Or, you said he got three (3). |
| **BENSON**: | [U/I] |

| | |
|---|---|
| OLIVER: | Huh? |
| **BENSON**: | Alright. Uh… |
| OLIVER: | What are you talkin' about? You don't remember? |
| **BENSON**: | [U/I]. I mean... |
| OLIVER: | Huh? |
| **BENSON**: | Naw, I guess I didn't. |
| OLIVER: | [COUGHS] [U/I] |
| **BENSON**: | When you coming back home? |
| OLIVER: | I should be back about four (4:00). Naw, about six (6:00). |
| **BENSON**: | About six (6:00)? |
| OLIVER: | Yeah. |
| **BENSON**: | Alight, let me see where he at. I'mma have him send you the money uh, I mean uh, pay you. |

In the above call, **BENSON** informed OLIVER that "dude" was coming to obtain a "bottle of wine**."** OLIVER responded by telling BENSON that there was no more wine. She further said "he" got "three." **BENSON** went on to tell OLIVER he was going to have "him" send "you" money. From training, experience, and the instant investigation, I again believe this was a continuation of the coded drug related phone calls. The number "three" is believed to be a quantity of methamphetamine as opposed to three bottles of wine. The "him" they are referring to is WALDON and **BENSON** confirmed with OLIVER that he (**BENSON**) was going to have "him" (WALDON) send money for the "three" bottles of wine (methamphetamine).

25

31.     An hour and half later, at approximately 3:40 PM, **BENSON** placed an outgoing call to WALDON. They had the following conversation:

| | |
|---|---|
| WALDON: | Yeah. |
| **BENSON**: | Yeah, let me guess, your phone went dead. |
| WALDON: | My... Yeah my phone went dead, but I was knocking at the door, hearing the motherfuckers jamming out and I guess they couldn't hear me over the knocks, so I came back downstairs for a minute. |
| **BENSON**: | Alright go back ... nobody is in the house. |
| WALDON: | Oh okay the radio was so loud I thought I heard somebody in there. |
| **BENSON**: | Go in cause my phone is about to go dead. |
| WALDON: | Okay [U/I] get off the mother fucker. I'm pulling back around. Gonna take me about two minutes... |

In the above call, **BENSON** and WALDON initiated the conversation as if **BENSON** had been trying to reach WALDON by phone. There were no contacts between the two phone numbers prior to this call, but agents know from previous communications that **BENSON** and WALDON likely communicate through a texting application. WALDON indicated that he was knocking on a door to **Target Residence**'s building, the **Target Residence,** or OLIVER's residence and no one was answering.[7]

32.     At approximately 4:26 PM, I observed WALDON exit one of the common doors of **Target Residence's** apartment building and enter the passenger side of a white Ford F150 displaying Missouri License Plate 3YV 043 parked on the street in front of 911 Locust. WALDON

---

[7]     The PLW on WALDON's cellular telephone placed WALDON within a geographical circle with an 889-foot radius from 909 Lucas, which also contains the **Target Residence**.

26

was only holding a cell phone. I observed the Ford F150 drive west on Locust. SA Dixon and I maintained surveillance on the Ford F150. At approximately 4:50 PM, I observed the Ford driving into the parking lot of the Hilton Garden Suites located at 4450 Evans Place, St. Louis, Missouri. After the vehicle was parked in the lot for a short period of time, I drove through the parking lot. The Ford F150 was unoccupied. The PLW on WALDON's phone was pinging in the vicinity of the hotel. Previous surveillance had also confirmed that WALDON was staying at the hotel.

33.     At approximately 5:25 PM, **BENSON** received an incoming call from WALDON. During the short call **BENSON** answered by saying "Yes" and WALDON stated, "Hey was that with her wages deducted?..." From training, experience, and the instant investigation, I believe this call was WALDON asking **BENSON** if the payment amount he was paying for methamphetamine included an additional fee that OLIVER would get for being involved in the transaction or if the amount that WALDON was paying did not include her fee.

34.     At approximately 6:09 PM, **BENSON** received an incoming call from OLIVER. During the call they had the following conversation:

**BENSON**:     Hello?

OLIVER:     Where you put the money at?

**BENSON**:     Under the door.

OLIVER:     Alright bye.

In this call, OLIVER was asking where the money was. **BENSON** was in Dallas, Texas. Given the content of the calls earlier and in light of the statement that **BENSON** made to OLIVER referencing that **BENSON** was going to have "him" (WALDON) send "you" (OLIVER) money. **BENSON** was informing OLIVER that WALDON put the money under the door. It is unclear

27

from this call if **BENSON** was informing OLIVER that the money was to be placed under the door of the **Target Residence** or OLIVER's residence.

35.     From the totality of the calls intercepted on March 24 and 25 between **BENSON** and WALDON and **BENSON** and OLIVER and my training and experience, it is clear to me and the other investigators that "bottles of wine" are referencing a quantity of methamphetamine. Further, **OLIVER** appears to be assisting **BENSON** in his conspiracy to distribute methamphetamine by storing "bottles of wine" (methamphetamine) and moving them back and forth for him from his apartment (**Target Residence)** to her apartment. It is believed from the totality of the intercepted phone calls and surveillance that **BENSON** is utilizing **Target Residence** to store methamphetamine. Further as demonstrated by the February 24 and March 17 sales to ROME, **BENSON** is selling methamphetamine from **Target Residence** on a frequent basis. Investigators and I do not know the full scope of **BENSON**'s methamphetamine distribution operation due to the fact that his conversations concerning drug distribution are coded and limited over his cellular telephone. **BENSON**, WALDON, and ROME have referenced texting and an application during intercepted calls typically when discussing details related to drug distribution.

**G.     Training and Experience of the Investigative Team.**

36.     As a result of my training and experience and that of the investigative team, we have knowledge of the following methods of operations concerning narcotics dealers and traffickers:

a.      Drug traffickers maintain on hand large amounts of United States ("U.S.") currency in order to finance their ongoing narcotics business.

b.      It is common for drug dealers to secrete contraband, proceeds of drug sales,

and records of drug transactions in their residence or other buildings under their control.

c.      Drug traffickers frequently keep near at hand, in their residence or other buildings under their control, paraphernalia for packaging, cutting, weighing and distributing of drugs. These paraphernalia include, but are not limited to scales, plastic bags, and cutting agents.

d.      Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, computer hard drives and disk records, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances. Drug traffickers commonly "front" (provide drugs on consignment) controlled substances to their clients. The aforementioned books, records, receipts, notes, ledgers, etc. are maintained where the drug traffickers have ready access to them, specifically in their residence or in other buildings under their control.

e.      Drug traffickers commonly maintain telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association in fact with persons known to traffic in controlled substances or to facilitate such trafficking. These records are maintained where drug traffickers have ready access to them, specifically, in their residence or in other buildings under their control.

f.      Drug traffickers take or cause to be taken photographs of them, their associates, their property and their product. These traffickers frequently maintain these photographs in their residence or other buildings under their control.

29

g.      Persons involved in large-scale drug trafficking conceal in their residence or other buildings under their control large amounts of currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances.

h.      When drug traffickers amass large proceeds from the sale of drugs that the drug traffickers attempt to legitimize these profits.  I know that to accomplish these goals, drug traffickers utilize financial institutions, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.   They maintain record of these transactions in their residence or other buildings under their control.

i.      Evidence of occupancy and residence including, but not limited to utility and telephone bills, canceled envelopes, rental or lease agreements, and keys, is relevant evidence in narcotics prosecutions.

j.      Drug traffickers frequently possess firearms and/or other weapons in their residence or other buildings under their control to protect their cocaine, heroin and/or United States currency.

## **CONCLUSION**

37.      Based upon the foregoing, your affiant asserts that there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, Possession with Intent to Distribute a Controlled Substance and Conspiracy to Possess with Intent to Distribute a Controlled Substance, can be found at the **Target Residence** further described in

30

Attachment A. I expect to find items and evidence as listed in Attachment B and request a search warrant for the **Target Residence** and to seize all those items.

## REQUEST FOR SEALING

38.    I further request that the Court order that all papers in support of this application, including the affidavit and warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

**I state under the penalty of perjury that the foregoing is true and correct.**

4/7/21
DATE

Christopher Eaves
Special Agent
Drug Enforcement Administration

**Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on April ___, 2021.**

NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

31

## ATTACHMENT A

The **Target Residence** is an apartment, or an individual dwelling unit, in as a seven-story multiple-dwelling apartment complex located in the City of St. Louis, State of Missouri with an address of **911 Locust Street, Apartment #204, St. Louis, MO 63101**. The building exterior is brownish red brick with commercial space located on the first floor. "Board of Education" is etched into the brick above the exterior entrance. The primary exterior entrance to enter the building is a double glass door secured entrance covered by a black awning that is identified as "The Lofts." The numerals '911' are listed on a glass pane above the double doors. **Target Residence** is an apartment located on the second floor of the building and numbered 204. The **Target Residence** is labeled with the numbers "204" affixed on or near the door to the apartment.

**ATTACHMENT B**

Articles of personal property tending to establish and document a conspiracy to distribute and possess with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 846 by **Jerron BENSON,** and others and that constitute fruits, evidence and instrumentalities of those violations, including:

a.   Controlled substances;

b.   Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including, but not limited to, scales, baggies and spoons;

c.   Books, records, receipts, notes, ledgers, computer hard-drives and disk records, and other papers relating to the transportation, ordering, purchasing and distribution of controlled substances and/or firearms;

d.   Telephone bills, invoices, packaging, cellular batteries and/or charging devices, cancelled checks or receipts for telephone purchase/service; cellular and/or landline telephones; digital and/or alphanumeric text (two-way) pagers; computers capable of e-mail and/or chat-room communication, answering machines; address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of sources of supply, of customers, and/or evidencing association with persons known to traffic in controlled substances or to facilitate such trafficking;

e.   Photographs, including photographs of co-conspirators, assets, or controlled substances;

f.   United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, papers, titles, deeds and other documents reflecting ownership of vehicles and property utilized in the distribution of controlled substances or which are proceeds from the distribution of controlled substances;

g.   Books, records, receipts, pay stubs, employment records, bank statements and records, money drafts, letters of credit, money order and cashier's checks receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money;

h.   Indicia of occupancy, residency, rental and/or ownership of the vehicles and/or premises described above, including, but not limited to, utility and telephone bills, cancelled envelopes, rental or lease agreements and keys; and

j.   Firearms and/or weapons.

33